UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DAVIS,

      Plaintiff,                              No. 04-CV-74792-DT

v.                                      Hon. Gerald E. Rosen

BROADSPIRE SERVICES INC. and
ABN AMRO NORTH AMERICA, INC.
LONG TERM DISABILITY PLAN ,

      Defendants.

_____/

OPINION AND ORDER GRANTING DEFENDANTS' MOTION
TO AFFIRM THE DECISION OF THE ERISA PLAN
ADMINISTRATOR AND DENYING PLAINTIFF'S MOTION
TO REVERSE THE PLAN ADMINISTRATOR'S DECISION

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 23, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                     United States District Judge

## I. INTRODUCTION

This ERISA denial of benefits action is before the Court on the Cross-Motions of

Defendants Broadspire Services, Inc. ("Broadspire") and the ABN AMRO North America,

Inc. Long Term Disability Plan ( the "Plan") and Plaintiff  Linda Davis, respectively

requesting affirmance and reversal of the ERISA plan administrator's decision denying

1

Ms. Davis' request for long-term disability benefits.  Having reviewed  Plaintiff's and

Defendants' briefs and the Administrative Record in this matter, the Court has determined

that oral argument is not necessary.  Therefore, pursuant to Local Rule 7.1(e)(2), this

matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Plaintiff Linda Davis is a former employee of Defendant ABN AMRO North

America, Inc. ("ABN AMRO"), a global banking group headquartered in The

Netherlands.  Ms. Davis worked for ABN AMRO in one of its Detroit-based branch

offices in various positions for more than twenty years, from September 16, 1980 through

May 31, 2002.[1]  Ms. Davis' most recent position with ABN AMRO was that of a Branch

Manager I.  Her last day on the job was Friday, May 31, 2002.

### ABN AMRO'S LONG-TERM DISABILITY PLAN

ABN AMRO and the ABN AMRO Long Term Disability Plan obtained a group

policy for long-term disability insurance, from the Lumberman's Mutual Casualty

Company ("Lumberman's"), an affiliate of Kemper Life Insurance Company ("Kemper")

in August 1, 2000, which was renewed from year to year thereafter. As an employee of

ABN AMRO, Ms. Davis was a participant in the ABN AMRO Long-Term Disability Plan

and covered by the Lumberman's group long-term disability policy.  Pursuant to the Plan's

definition of "disabled/disability,"

---

[1]  Ms. Davis was originally employed at Michigan National Bank, which later became
Standard Federal Bank.  Standard Federal was subsequently acquired by ABN AMRO
and is now known as "La Salle Bank."

2

Disabled/Disability means our determination that a significant change in
your physical or mental condition due to:

1. Accidental injury;
2. Sickness;
3. Mental Illness;
4. Substance Abuse; or
5. Pregnancy

began on or after your Coverage Effective Date and prevents you from
performing, during the Benefit Qualifying Period[2] and the following 24
months, the Essential Functions of your Regular Occupation or a Reasonable
Employment Option offered to you by the Employer, and as a result you are
unable to earn more than 60% of your Pre-disability Weekly Income.

After that you must be so prevented from performing the Essential Functions
of any Gainful Occupation that your training, education and experience
would allow you to perform.

Admin. Rec., p LGD0405 (footnotes added).

The Plan Document defines "Essential Functions" as "functions which are normally

required for the performance of an occupation, and which cannot be reasonably omitted or

modified." *Id.* at LGD0419.  "Regular Occupation" is defined as

[T]he activity which, immediately prior to the injury or start of the sickness
for which you are receiving benefits under This Plan:
1.  You were regularly performing; and
2.  Was the source of your income from the Employer.

Your Regular Occupation is not limited to the specific position you held

---

[2]  The "Benefit Qualifying Period" is
      The last to occur of:
      1.  The termination of [the employee's] benefits under any salary
      continuation or short term disability benefits plan sponsored by the
      Employer; or
      2.  6 Months of Disability.
Admin, Rec., p. LGD0403.

with the Employer, but could instead be a similar activity that could be performed by the Employer or another employer, based on job descriptions provided by the Employer or included in the most current volume of the U.S. Department of Labor's <u>Dictionary of Occupational Titles.</u>

We will look at how the activities of an occupation are performed in the national economy, instead of how work tasks are performed for a specific employer or in a specific area or region such as the region where you resided prior to the injury or start of the sickness for which you are receiving benefits under This Plan.

Admin. Rec., p. LGD0422.

With respect to benefit payments, the Plan Document provides:

A Benefit Qualifying Period begins on the day you become Disabled. During this period [i.e., the first six months after becoming disabled], no benefits are payable for your Disability and you must be under the Regular and Appropriate Care of a Physician.[3] We reserve the right and opportunity to examine you during the Benefit Qualifying Period and to perform rehabilitation testing we determine appropriate. . . .

---

[3] "Regular and Appropriate Care" under the Plan means:

1. You personally visit a Physician as often as is medically required, according to generally accepted medical standards and consistent with the stated severity of your medical condition, to effectively manage and treat your sickness or injury; and

2. You are receiving care which:
   • conforms with the stated severity of your medical condition;
   • is consistent with the stated severity of your medical condition; and
   • is rendered by a Physician whose specialty or experience is the most appropriate for your Disability according to generally accepted medical standards; and

3. You are receiving or actively seeking appropriate physical or psychological rehabilitative care.

LGD0422.

\* \* \*

> We will pay the benefits shown in the Plan Summary section if a significant change in your physical or mental condition:
> 1.  Begins while you are covered under the Group Policy; and
> 2.  Causes you to be Disabled throughout the Benefit Qualifying Period and afterward.
>
> You must be Disabled as defined according to the terms of the Group Policy and under the Regular and Appropriate Care of a Physician for your Disability.  While you are receiving benefits and services, we reserve the right and opportunity to examine you and to perform rehabilitation testing we determine appropriate.
>
> Benefits begin to accrue once you satisfy the applicable Benefit Qualifying Period.

Admin. Rec. p. LGD0410.

The Plan Document designates ABN AMRO as the Plan Administrator.  The administrative record further indicates that ABN AMRO delegated its administrative authority to its insurer, Lumberman's.  *See* LGD0424.

In the "Allocation of Authority" provision, the Plan Document reserves to Lumberman's, the discretionary authority to administer the Plan.  This provision states

> We reserve full discretion and authority to manage the Group Policy, administer claims, and interpret all policy terms and conditions, this includes but is not limited to, the right to:
> 1. Resolve all matters when a review has been requested;
> 2. Establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
> 3. Determine your eligibility coverage;
> 4. Determine whether proof of your loss is satisfactory for receipt of benefit payments according to the terms and conditions of the Plan.

LGD0417.

5

Lumberman's, through its corporate affiliate, Kemper, contracted with Broadspire (f/k/a Natlsco, Inc.) and delegated to Broadspire its discretionary authority to interpret the terms of the Plan and to determine a claimant's eligibility for benefits under the Plan. Admin. Rec., p. LMB0001-0038.[4]

PLAINTIFF'S PERTINENT MEDICAL HISTORY

On Monday, June 3, 2002, Ms. Davis took a medical leave of absence from her job with ABN AMRO from which she never returned.  The Administrative Record establishes that on June 4, 2002, Ms. Davis went to see Dr. Carl Christensen, M.D., a gynecologist at the Gynecologic Oncology Division at Hutzel Hospital, with whom she had treated for cervical cancer 10 years earlier,[5] complaining of "severe left side pain, radiating down the left leg[,] difficulty urinating and [being] unable to walk."  *See* Admin. Rec., p. LGD0098. According to a Physician's Statement submitted by Dr. Christensen, June 4, 2002 was date on which Ms. Davis reported that these symptoms first appeared.  *See* Attending Physician's Statement, Admin. Rec., p. LGD0186.  No office tests were performed on Ms. Davis by Dr. Christensen at this time; instead, she was immediately admitted to Hutzel Hospital because of the doctor's concern of a possible recurrence of Ms. Davis' cervical

---

[4]  This delegation of discretionary authority also applied to the ABN AMRO Short-Term Disability Plan.  LMB0001-0038.

[5]  In 1989, Ms. Davis was diagnosed with stage 1B cervical cancer.  This was treated with surgery -- a hysterectomy.  *See* Admin. Rec., p. LGD0098 and LGD0186.  She had a recurrence of the cancer on the right pelvic sidewall in 1990 which was successfully treated with chemotherapy and she had no recurrences in the ensuing 12 years.  *Id.*  Dr. Christensen had not treated Ms. Davis since the mid-1990s until she came to see him with the complaints of the pain in her left leg on June 4, 2002.  *See* Admin. Rec., p. LGD0098.

carcinoma.

X-rays and tests performed during her four-day hospitalization showed no recurrence of her cancer and bursitis was the suspected cause of her hip and leg pain. Admin. Rec. p. LDD0098.  A CT scan, however, showed a suspicious mass on her kidney. Therefore, upon her discharge from the hospital, Ms. Davis was referred for follow-up treatment to Wayne State's Rheumatology Clinic and to the Urology Unit for follow-up on the suspicious mass on her kidney.

At the Rheumatology Clinic, Plaintiff was treated by Dr. Ndudi Oparache, M.D. and Dr. Mihail Moroianu, M.D. in July and September 2002, who diagnosed intertrochanteric bursitis[6] and gave Ms. Davis steroid injections for the pain in her hip and leg.  Dr. Moroianu also scheduled Ms. Davis for physical therapy at the Rehabilitation Institute of Michigan which she started, but shortly thereafter, she discontinued the therapy complaining that it was too painful.

Ms. Davis also treated with Dr. Richard Santucci, M.D. of the Urology Division in August and September 2002.  Dr. Santucci performed an MRI and other tests on Ms. Davis' kidneys.  These tests revealed that the mass seen on her kidney was a benign cyst and was determined to be of no concern at that time.  *See* Admin. Rec. pp. LGD0101-102. She also was treated for a urinary tract infection and for urinary stress urgency.  *Id.*  These problems were successfully treated and there were no further urological symptoms as of

---

[6]  X-rays and tests prescribed by the Rheumatology Division doctors on Ms. Davis' hip and cervical spine showed no evidence of fracture or dislocation, normal bone density, normal disks and well-maintained spaces between the disks.  *See* LGD0128-141.

September 16, 2002.  *Id.* pp. LGD0091-92.

At around the same time that Ms. Davis sought treatment for her hip and left leg pain, she also sought treatment for numbness and tingling in her hands.  On June 11, 2002, i.e., a week after she went on medical leave from ABN AMRO and three days after she was discharged from the hospital, Plaintiff saw Dr. Edward Burke for the hand numbness. *Id.* pp. LGD0121-122.  Dr. Burke suspected carpal tunnel syndrome.  *Id.*  He prescribed vitamin B supplements and gave her wrist braces to wear at night.  *Id.*  But he placed no work restrictions on her and advised that she could return to work that same day, June 11, 2002.  *Id.*  He did, however, schedule her for a nerve conduction study (an EMG).

The nerve conduction study was performed on June 24, 2002 by a neurologist, Dr. Mark Olson, M.D.  The study did not reveal any specific abnormalities and Dr. Olson was not able to confirm the presence of carpal tunnel syndrome on either side.  Admin. Rec. p. LGD0123.

PLAINTIFF'S INITIAL APPLICATION FOR DISABILITY BENEFITS

As an employee of ABN AMRO, Ms. Davis was a participant in the ABN AMRO health and welfare benefit plans, including the company's Short-Term and Long-Term Disability Plans.  On August 19, 2002, Plaintiff telephoned Broadspire Services, Inc. , the administrator of ABN AMRO's Short and Long-Term Disability Plans, to apply for Short-Term Disability benefits ("STD").  She informed intake clerk, Daniel Smith, that she was unable to work due to "chronic bursitis in her left hip, a mass on her kidneys, and arthritis in her left knee and spine" and that she did not know when she would be able to return to

work. Admin. Rec., p LGD0001-0003. Ms. Davis identified Dr. Carl Christensen and

Dr. Richard Santucci as her treating physicians, and identified their respective specialties

as oncology and urology. *Id.*

Mr. Smith informed Ms. Davis that in order to authorize STD benefits, Broadspire

would need to obtain "objective medical information," concerning her condition from her

treating physicians. *Id.* at LGD0003. Smith explained that Broadspire "consider[s] such

things as medical examination findings, test results, and x-ray results as objective medical

information from your doctor." *Id.* Smith also told Ms. Davis that Broadspire must have a

signed medical authorization from her so that they could contact her doctors. *Id.*

Ms. Davis provided her signed authorizations and Broadspire faxed a request for

Ms. Davis' medical records to Dr. Christensen and Dr. Santucci on August 22, 2002, and

advised the doctors that the information was needed by September 4, 2002. *See id.*, pp.

LGD0005-0007. No records were immediately forthcoming, and therefore, Broadspire

again faxed requests to the doctors on August 26 and 28. *Id.* at LGD0007-0008.

Meanwhile, on August 20, 2002, Broadspire again contacted Plaintiff Davis and

explained to her the determination process and told her that her help would be needed in

getting her medical records from her doctors by September 4, 2002. *Id.* at LGD0007.

During this August 20 Patient Contact, Ms. Davis informed Broadspire that she had also

treated with Dr. Moroianu, Dr. Oparache and Dr. Burke. *Id.* Accordingly, these doctors

were also faxed requests for records. *Id.* at LGD0012.

When by August 28, 2002, medical records had not yet been received, Broadspire

9

again contacted Plaintiff and advised her that records had not yet been obtained and
informed her that STD benefits would be denied if medical data substantiating that she had
a disability as defined in her company's STD plan was not received by September 4, 2002.
*Id.* at LGD0008.

When by September 4 the medical records were not received, however, Broadspire
continued to make repeated requests for them during the ensuing month.  *See id.* LGD
0008-00024.   Finally all of the pertinent records were received by the end of September.

Although the records from Drs. Burke and Santucci indicated that they did not
consider Ms. Davis to need to be off work or to be disabled,[7] Dr. Christensen directed that
Plaintiff be off-work due to her bursitis.  *See* LGD0019-0022.  He indicated in his
September 27 treatment note that Plaintiff would be unable to work for three weeks. Based
upon its review of these medical records, Broadspire authorized payment of Short-Term
Disability benefits.  Admin. Rec., p. LGD0016.

On October 2, 2002, Broadspire conducted a Triage Review to consider of
transitioning Plaintiff from Short-Term to Long-Term Disability.  *See id.* LGD0023.  At
this Triage Review, it was noted that STD guidelines normally called for Short-Term
disability benefits for the kind of disabilities presented by Plaintiff for only 35-56 days.
*Id.*  Because under the normal guideline scheme Plaintiff's eligibility for STD benefits

---

[7]  Dr. Santucci specifically noted his confusion as to why the disability plan administrator
was contacting him concerning diagnoses for Ms. Davis.  He noted in his September 16,
2002 report that the repeated contacts from the plan administrator were "somewhat
puzzling to me, because apparently the patient is disabled because of a hip difficulty and
nothing to do with urology."  *See* LGD0091.

10

would likely expire within three weeks, an STD/LTD transition meeting was scheduled for the following day, October 3, 2002. *Id.*  Transition team members were directed to bring copies of all of Plaintiff's medicals to the meeting at which transition to LTD would be considered. *Id.*

On October 3, 2002, the transition committee met.  Based on the medical records that Broadspire had received, and the apparently then anticipated expiration of Plaintiff's STD within a few weeks, a determination was made not to send Plaintiff an application for Long-Term Disability at that time. *Id.*

Ten days later, on October 13, 2002, a copy of all of Plaintiff's medical records was forwarded to the Long-Term Disability division. *Id.*[8] And, on October 25, 2002, an application for Long-Term Disability benefits was sent to Plaintiff. *Id,* at LGD0034; LGD0175-76.

PLAINTIFF'S APPLICATION FOR LONG-TERM DISABILITY BENEFITS

On October 28, 2002, Plaintiff submitted her completed "Employee Long-Term Disability Plan Benefit Application" form to the Plan Administrator.  She stated in her application for benefits that she was unable to work because of her inability to "walk or stand or sit for more than 10 minutes"  due to "bursitis, sciatic nerve, and lower back

---

[8]  On October 22, 2002, the following entry was made in the administrator's notes:, "Employee has 1 week before I would start the denial process; I don't expect her provider to get the answer I need by 10/25; they have not in the past"  LGD0031.  On October 23, 2002, the following entry was made, "will be going to  LTD" LGD0033.  On October 25, 2002, the following entry was made, "Tell LTD to send application."  LGD0034.

[pain]". *Id.* Dr. Mihail Moroianu, M.D., the rheumatologist who treated Plaintiff in July

and September (and again in early November 2002) and Dr. Carl Christensen, the

gynecologic oncologist, who saw Plaintiff in June and then once again in October 2002,

provided the Attending Physician's Statements in support of her LTD claim. *See*

LGD0084-0085; LGD0186-0187.

Dr. Moroianu's primary diagnosis of Plaintiff was "chronic pain syndrome" and

"left trochanter bursitis" which manifested itself with "pain and tenderness [to Ms.

Davis's] left hip and low back." *See* Attending Physician's Statement at LGD0084-85. Dr.

Moroianu indicated that he first treated Plaintiff for this condition on July 18, 2002, and

that he saw her "every 2-3 months." *Id.* at LGD0084.  He noted that Plaintiff's progress

since he first saw her was "unchanged," but that he expected her to improve in "1-2

months." *Id.* at LGD0085.

In terms of "Physical Impairment," Dr. Moroianu checked Class 2 and Class 3

impairments on the physician's form -- "'slight' [to] "'moderate' limitation of functional

capacity" -- noting that Ms. Davis was capable of light to medium manual work. *Id.*  And,

the only restrictions Dr. Moroianu placed on Ms. Davis' activities were to limit long

periods of time standing and sitting. *Id.* at LGD0085.

Dr. Christensen's Attending Physician Statement submitted a month later listed as

his primary diagnosis of Plaintiff "cervical carcinoma" and as "complications" stated

"recurrence 1990, treated with chemotherapy.  Developed sever left hip pain 2002,

unresponsive to physical therapy, steroid injections."  LGD00186.

With respect to prognosis, Dr. Christensen stated "cervical cancer is in remission," with an added note, "no relief from pain."  LGD0187.  Dr. Christensen indicated that her progress since he saw her on June 4, 2002 remained "unchanged."  *Id.*  However, as opposed to Dr. Moroianu's projection of improvement within 1-2 months, Dr. Christensen indicated that Plaintiff had achieved the maximum medical improvement he expected to see in her.  *Id.*  Additionally, contrary to Dr. Moroianu's finding of slight to moderate limitation of functional capacity and notwithstanding Dr. Christensen's previous September 27, 2002 treatment note that Plaintiff was unable to work for only three additional weeks as of that date (i.e., until mid-October), in his November 13, 2002 Attending Physician's Statement,  Dr. Christensen checked the box for Class 5 Physical Impairment -- "Severe limitation of functional capacity/incapable of sedentary work."  *Id.*

The Administrative Record reveals that the Long-Term Disability Division of Broadspire had obtained all of Plaintiff's Short-Term Disability medical records (discussed above) from Broadspire's Short-Term Disability division as of November 15, 2002.  *See* Admin. Rec., p. LGD0436.  The Plan Administrator also received additional records from Dr. Burke, the hand surgeon, regarding a follow-up examination of Ms. Davis on November 7, 2002.  In this follow-up report, Dr. Burke stated that

> Clinically and electrically, I have not been able to find compressed nerves in the neck area or in the carpal tunnel area.  Recent studies show that the nerves are conducting normally through the wrist area.  Additionally she has had an MRI carried out here at Harper, indicating that there is no evidence of impingement on any nerves.

Admin. Rec. LGD0183.  Accordingly, as with his June 11, 2002 evaluation, Dr. Burke

13

placed no work restrictions on Plaintiff.

The record also shows that on November 26, 2002, Plaintiff saw Dr. Wook Kim, M.D., a physiatrist in Rochester, Michigan. Dr. Kim found that Ms. Davis had a full range of motion of the neck but that she showed some weakness on the left side of her body, although her symptoms were on her right side. Dr. Kim gave Plaintiff a sacroiliac joint injection with a local anesthetic on that date after which he reported that Ms. Davis "felt better" and that "walking did not produce pain." He recommended that she follow-up with him in two or three weeks, and gave her an off-work slip which stated that she was "Totally incapacitated" until January 11, 2003 due to "Neck sprain syndrome" and "Low back sprain syndrome." *See* Admin. Rec. p. LGD0268-69.

Upon reviewing Plaintiff's medical records, the benefits examiner determined that it needed a detailed description from ABN AMRO of Plaintiff's specific, physical job requirements. Although Broadside and Lumberman's already had ABN AMRO's human resources job description of a "Branch Manager I," the benefits examiner requested a description of the daily job duties, specifically, whether the job was basically a sedentary position; whether standing was involved and if so, how often; whether any lifting was involved, and if so, how many pounds and how often; whether traveling was involved and if so how often; and whether stair climbing is involved. *See* LGD0044.

ABN AMRO responded to the insurer's request and provided the following description:

Managers conduct sales meetings with their staff. They help customers at

14

their desk and supervise the operations of the facility.

Managers get up frequently to fax, make copies and give transactions to tellers to process.

Managers would have to reach for items on credenzas and in desk drawers.

Maximum pounds to lift would be 2 pounds.

[A] manager would possibly have to carry a brief case and four or five file folders.

The expectation for managers to be out of the office making business calls is two days a week with four calls per day.  This would involve limited travel in their market area.

There are no stairs at [] Linda Davis['] branch office.  However, there could possibly be stairs at the business clients['] offices.

*See* Admin. Rec. p. LGD0051.

Upon receiving this description of job duties from the employer, Broadside requested that an independent, peer-to-peer medical review be performed by Martin Mendelssohn, M.D., an orthopedic surgeon.  The specific referral question posed to Dr. Mendelssohn was, "Is this employee disabled from her own occupation?"  *See* LGD0040.

Dr. Mendelssohn reviewed all of the medical records concerning Ms. Davis submitted by Dr. Santucci, Dr. Christensen, the various physicians in Wayne State's Rheumatology clinic, and Dr. Kim, and summarized these records in his report.  He also summarized the records concerning Plaintiff's carpal tunnel problems.  Dr. Mendelssohn also reviewed Plaintiff's job analysis worksheet and specifically noted that she claimed she had to sit five hours, walk three hours as well as generate referrals by visiting other

15

officers on a fairly regular basis. *Id.*

Dr. Mendelssohn further did a peer-to-peer review with Dr. Kim on December 4, 2002, and noted that Dr. Kim had only seen Ms. Davis once. *See* LGD0042. Dr. Mendelssohn also explained to Dr. Kim Plaintiff's job functions as a bank manager and specifically pointed out to Dr. Kim that Ms. Davis' position requires her to go to different offices in addition to working as a manager of the one bank branch. According to Dr. Mendelssohn, Dr. Kim was "uncommitted" with respect to Plaintiff's ability to work. *Id.*

Noting "the lack of any significant objective [orthopedic or neurological] findings" in the medical documentation supplied by Plaintiff and her doctors other than "discomfort over the greater trochanter as well as some decrease in muscle strength which is not very well quantified," Dr. Mendelssohn concluded from reviewing Ms. Davis' chart that "her symptoms are mainly subjective in nature" and that "a functional impairment that would preclude the claimant from her regular occupation as a branch manager cannot be substantiated." *Id.*

Based upon Dr. Mendelssohn's review, the determination was made by the Plan Administrator to deny Ms. Davis' application for Long-Term Disability benefits. On December 19, 2002, Broadspire notified Plaintiff of its denial of her claim, detailing in its denial letter the review of her case by Dr. Mendelssohn and the finding that the documentation provided by her physicians did not substantiate her disability status. *See* Admin. Rec., pp LGD0197-0199.

PLAINTIFF'S ADMINISTRATIVE APPEAL OF THE DENIAL OF HER CLAIM

16

On January 7, 2003, Ms. Davis filed an administrative appeal.  *See* Admin. Rec., p. LGD0201.  In her appeal letter, Ms. Davis stated that she was continuing treatment with Dr. Kim, that she had received more injections in her back and that, by his prescription, she was taking Celebrex, Tylenol #3 and Amitriptyline for pain. *Id.*  She claimed that she needed assistance of a cane to walk.  *Id.*  She also stated that she had had a follow-up visit with Dr. Moroianu at the Rheumatology clinic.  *Id.*

In appealing the denial of Long Term Disability benefits, Ms. Davis submitted additional materials from physicians including additional records from Dr. Kim evidencing treatment with him on December 11 and 23, 2002 and January 29, 2003.  The records revealed that at these appointments, Dr. Kim performed thoracic facet joint nerve blocks on Ms. Davis and gave her sacroiliac joint injections. Admin. Rec., pp.LGD196, 203-04, 275.  After each such treatment, Dr. Kim reported that the procedures done on Ms. Davis "reduced her pain considerably" and that each time she was "discharged home in good condition."  *Id.*

Plaintiff also submitted a progress report regarding her follow up visit to the Rheumatology Clinic dated January 30, 2003 from Dr. Moroianu.  *See* LGD0278-279. Dr. Moroianu stated that Ms. Davis continued to complain of pain in the lower back and left hip area, however, he noted that an EMG conducted on December 11, 2002 revealed no evidence of cervical radiculopathy, peripheral polyneuropathy, carpal tunnel syndrome, or ulnar neuropathy. *Id.*  Dr. Moroianu further noted that Ms. Davis possessed a full range of motion of both hips  *Id.*.  However, because Ms. Davis complained of depression, Dr.

Moroianu recommended that Ms. Davis get a referral from her primary care physician to see a psychiatrist for treatment. *Id.*

Plaintiff heeded Dr. Moroianu's suggestion and on February 7, 2003, she saw Dr. Thomas Park, M.D., a psychiatrist in Detroit. On February 14, 2003 Plaintiff submitted a three-sentence "To Whom It May Concern" letter from Dr. Park in further support of her appeal, which stated

> This letter is being written in regards to Ms. Linda Davis. Ms. Davis has been a patient under my care since February 7, 2003 under the diagnoses of Major Depression and chronic pain syndrome. She has been medically disabled since June 2001 due to chronic pain syndrome for which she has seen several specialists.
>
> At this time, Ms. Davis is totally disabled due to the above-mentioned diagnoses until further notice.

Admin. Rec. p. LGD0280

On February 28, 2003, Dr. Park completed a "Behavioral Health Clinician Statement" that diagnosed Ms. Davis with major depression DSM 296.33 and 307.89 and stated that Ms. Davis was unable to work, with a return to work date indicated as "undetermined." *See* LGD282.

BROADSPIRE'S EVALUATION OF PLAINTIFF'S APPEAL

Upon receiving Plaintiff's appeal and the additional medical records provided in support of her appeal, Broadspire had Plaintiff's medical file submitted for peer review by a psychologist, an orthopedic surgeon, a rheumatologist and an OB/GYN.

On March 11, 2003 Dr. Lawrence Burstein, PhD., a psychologist, reviewed Ms.

18

Davis' file including information provided by Ms. Davis, her job function, and Dr. Mendelssohn's review.  Dr. Burstein noted that "the submitted documentation primarily relates to Ms. Davis' physical problems" and that "there is no clinical information regarding psychological problems until 2003."  Admin. Rec. pp. LGD0362-363.  Dr. Burstein further noted that although Plaintiff's psychologist, Dr. Park, asserted that Ms. Davis was disabled due to her physical diagnoses as well as her depression, Dr. Park "does not offer any examination findings to support this."  *Id.*  With regard to Dr. Park's clinician's statement in which Dr. Park reported that Ms. Davis had some difficulty with the performance of mathematical operations as well as her self-reports of memory difficulty, Dr. Burstein observed that Dr. Park also reported that Ms. Davis stated that she is able to use the phone, shop, prepare meals, and drive.  *Id.*  Further, Dr. Burstein noted that "due to the changeable nature of psychological conditions" Dr. Park's clinician's report "does not necessarily reflect Ms. Davis's status from December 20, 2002 until the date of the examination on 02/28/03," and that in order to substantiate that Ms. Davis was unable to perform the core elements of her occupation on December 20, 2002 from a psychological perspective, her providers would have had to have submitted examination findings documenting the presence of impairments.  Examples of such findings would include behavioral observations, including the frequency, duration, and intensity of symptoms observed, result of formal mental status examination, or performance based tests of psychological functioning with standardized scores.  *Id.*  Based on the lack of such findings, Dr. Burstein concluded Ms. Davis was not psychologically precluded

19

from performing her own occupation. *Id.*

Dr. Robert Ennis, M.D., an orthopedic surgeon, also reviewed Ms. Davis' file on March 6, 2003. *See* Admin. Rec. pp. LGD0365-367. Dr. Ennis noted that Ms. Davis' reported pain in her upper extremities and hands in June 2002 but that EMG studies did not reveal carpal tunnel syndrome. *Id.* Dr. Ennis further noted that x-rays taken of Ms. Davis pelvis and MRI of the spine, while under the care of Dr. Moroianu for left hip pain, did not reveal any evidence of herniated disc, spinal stenosis, or recurrence of pelvic tumor. Dr. Ennis also noted that Dr. Moroianu's rheumatologic evaluation revealed low back pain due to mild degenerative disease, fibromyalgia, and left trochanteric bursitis. *Id.* Dr. Ennis also reviewed Dr. Mendelssohn's report of his review of Plaintiff's case and observed that Dr. Mendelssohn found a lack of objective documentation for Plaintiff's continued subjective complaints. *Id.* Finally, Dr. Ennis reported on his review of the records provided by Dr. Kim. *Id.*

Dr. Ennis observed that in none of the records provided by Plaintiff's various doctors was there "any indication as to any specific functional or physical impairment that would prevent her from doing a sedentary or light work activity." *Id.* Dr. Ennis explained that the records show that Ms. Davis

> was found to have full range of motion on both hip joints, straight leg raising to 60° bilaterally, and neurologic evaluation was within normal limits, showing no evidence of sensory or motor loss and intact deep tendon reflexes.

*Id.*

20

Accordingly, Dr. Ennis concluded that

> Based upon the findings of the medical documentation presented. . . there
> does not appear to be sufficient objective evidence to conclude that [Ms.
> Davis] is incapable of returning to her own sedentary work activities at the
> present time.

*Id.*

On March 7, 2003, Yvonne Sherrer, M.D., a rheumatologist, reviewed Ms. Davis'

entire case file, including Dr. Moroianu's and Dr. Kim's records, focusing particularly on

the various objective tests performed on Plaintiff from June through December 2002.  Dr.

Sherrer noted, in particular, that Dr. Moroianu's exam revealed a full range of motion of

both hip joints, straight leg raising to 60 degrees bilaterally, and a neurological evaluation

revealed no sensory or motor loss with deep tendon reflexes +2 in all extremities.  Admin.

Rec. at p. LGD370-371.  Dr. Sherrer also relied heavily on the physical therapy reports

and the x-ray reports including the lumbar spine films and the cervical spine films. *Id.*

Although Dr. Sherrer noted that Dr. Christensen rated Plaintiff's level of

impairment as "class 5 incapable of sedentary work," Dr. Sherrer observed there was no

objective support for the gynecologist's determination.  *Id.*  Therefore, based upon her

review of the file, Dr. Sherrer concluded

> In summary here, we have an individual who has presented with multiple
> pain syndromes over the last year, most of which are disproportionate to
> objective findings.  She has presented to several examiners with symptoms
> of carpal tunnel syndrome and on more than one occasion EMG/nerve
> conduction studies have failed to show evidence of carpal tunnel syndrome
> or other neurological abnormality and neurological exams have been normal.

> Likewise, she has presented with severe left hip are pain, extensive investigation for metastatic disease has been negative and there has been no objective findings to account for the pain syndrom.  In addition, she has gone on to develop other pain complaints, for where there has been minimal objective findings for which she has failed to respond significantly to any treatments. . . .
>
> . . .  On the basis of rheumatic disease, there is no objective evidence in these documents to support this claimant being disabled from a light level of exertion occupation.

Admin. Rec., p. LGD0371.

Finally, on March 7, 2003, Dr. Steven Schneider, M.D., an OB-GYN, reviewed Ms. Davis' file. Dr. Schneider noted that the records showed no recurrence of Ms. Davis' cervical cancer and observed that Plaintiff's own gynecologist, Dr. Christensen, confirmed this.  Admin. Rec. p. LGD0374-375.  Dr. Schneider was, therefore, particularly puzzled

> From a gynecological standpoint, . . . as to why the claimant's gynecological oncologist is attributing the claimant's pain to her diagnosis of cervical cancer which was successfully treated 13 years ago.  According to his own notes, Dr. Christensen has been clear that there has been no recurrence.

*Id.*

Thus, Dr. Schneider opined,

> Obviously one can tell from his letters the Dr. Christensen is a very caring and compassionate patient advocate and this claimant may have a disabling chronic pain syndrome, but it is clear from all of the information received and reviewed from a gynecological standpoint, there is no objective data to support that a functional impairment exists that would preclude the claimant from performing her light duty position as a branch manager I.

*Id.*

Following the independent medical evaluations, on March 23, 2003 Broadspire sent

a letter notifying Ms. Davis that her appeal for benefits was denied. *See* Admin. Rec. pp.

LGD386-387. The letter informed Ms. Davis of all of the records that were reviewed with

regard to her appeal and further informed her that "[t]o afford you every opportunity

available, Kemper Peer Physicians specializing in Psychology, Orthopedic Surgery,

Rheumatology and Obstetrics and Gynecology reviewed your claim file." *Id.* In sum, the

denial letter explained:

> The KNS Appeal Committee found that the submitted documents lacked
> medical evidence (i.e. behavioral health observations, results of mental
> status examinations, psychological testing with results, abnormal range of
> motion, abnormal neurological findings, abnormal EMG results, etc.)
> supporting changes in your physical and/or mental condition that would have
> prevented you from performing the essential functions of your regular
> occupation as a Branch Manager I and has recommended upholding the
> original denial of Long Term Disability Benefits, effective 12/02/02.

*Id.*

Having exhausted her administrative appeal rights, Plaintiff subsequently filed this

ERISA action.

## III.  DISCUSSION

A.  STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES

The Supreme Court has ruled that the standard of review in ERISA cases is *de novo*

unless the benefit plan gives the plan administrator discretion to determine eligibility for

benefits or construe plan terms:

> Consistent with established principles of trust law, we hold that a denial of
> benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*
> standard unless the benefit plan gives the administrator or fiduciary
> discretionary authority to determine eligibility for benefits or to construe the

terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989).

*See also, Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).

Alternatively, "where an ERISA plan expressly affords discretion to trustees to make

benefit determinations, a court reviewing the plan administrator's actions should apply the

arbitrary and capricious standard of review." *Williams v. International Paper Co.,* 227

F.3d 706, 711 (6th Cir. 2000).

Here, the parties are in agreement that the standard of review is the arbitrary and

capricious standard because Broadspire had the discretionary authority to construe and

interpret the benefit plan at issue. [*See* Plaintiff's Brief at 10; Defendant's Brief at 14-16].

As such, this Court's review of Broadspire's decision is based solely upon the

administrative record.  *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th

Cir. 1998).

B     BROADSPIRE DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN
      <u>DENYING PLAINTIFF'S CLAIM FOR DISABILITY BENEFITS</u>

The arbitrary and capricious standard is a highly deferential one.  *See Killian v.*

*Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 520 (6th Cir.1998) (quoting *Yeager v.*

*Reliance Standard Life Ins. Co*., 88 F.3d 376, 380 (6th Cir.1996)) ("where, as here, the

plan administrator is given the discretionary authority to determine eligibility for benefits

or to construe the plan terms, 'we review the administrator's decision to deny benefits

using 'the highly deferential arbitrary and capricious standard of review.'")  Under the

24

arbitrary and capricious standard, a court will uphold a plan administrator's benefit determination if that determination was rational in light of the plan's provisions. *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1987), *cert. denied*, 488 U.S. 826 (1988). Stated differently, "when it is possible to offer a reasoned explanation, based on evidence for a particular outcome, the outcome is not arbitrary and capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990) . *See also*, *Marchetti v. Sun Life Assurance Company*, 30 F. Supp. 2d 1001, 1008 (M.D. Tenn. 1998).

While Plaintiff acknowledges that the arbitrary and capricious standard applies, she contends that because the Plan Administrator is also the insurer who pays the disabilities claims, there is an inherent conflict of interest involved. Plaintiff further argues that the fact that Lumberman's used Broadspire  to administer its Long-Term Disability Plan did not eliminate this conflict of interest because Lumberman's had a clear incentive to contract with a company whose medical experts would be inclined to find in its favor and deny claims for disability benefits. Plaintiff claims that such a conflict of interest operates to lower the deference that the Court is required to give to Broadspire's determination under the arbitrary and capricious standard.

Although Plaintiff is correct that a conflict of interest is presented in this case, the Sixth Circuit has categorically and repeatedly rejected the argument that a higher standard should apply in ERISA cases involving a conflict of interest. *See, Kalish v. Liberty Mutual Life Assurance Co.*, 419 F.3d 501, 501 (6th Cir. 2005); *Calvert v. Firstar Finance,*

25

*Inc.*, 409 F.3d 286, 293 (6th Cir. 2005); *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir.1998). Instead, the Court of Appeals has instructed that where a plan sponsor bears the risk of paying claims and also appoints the body as the final arbiter of such claims, district courts should be particularly vigilant in reviewing the administrative record, *see University Hosptials of Cleveland*, 202 F.3d 839, 847 (6th Cir. 2000), and that such an inherent conflict of interest should be taken into account as a factor in determining whether the administrator's decision was arbitrary and capricious. *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527-28 (6th Cir. 2003), *overruled on other grounds*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

Guided by these principles, the Court has conducted a vigilant review of the administrative record in this case, and even after taking into account the conflict of interest presented, the Court finds that Plan Administrator's denial of long term benefits was not arbitrary or capricious. Here, the administrative record more than abundantly supports the conclusion that Broadspire's decision was both reasonable and "rational in light of the plan's provisions."

The Plan Administrator's stated reason for denying Plaintiff's claim for benefits was that the documentation provided by her physicians did not substantiate Plaintiff's claim that she was disabled, i.e., unable to perform the essential functions of her position as a Branch Manager I. Plaintiff applied for long-term disability benefits claiming a disabling impairment due to "bursitis, sciatic nerve and lower back pain." However, none of the doctors who treated Plaintiff provided any objective evidence to substantiate this

claimed disability.  All of the x-rays, CT scans, and physical tests showed no evidence of fracture or dislocation, and no bulging or ruptured disks.  To the contrary her spinal disks were all normal and x-rays and tests showed well-maintained spaces between the disks. The physical tests evidenced full range of motion in both hips.  The EMGs and nerve conduction tests showed no abnormalities.

Furthermore, Dr. Moroianu, the one treating physician whose specialty, rheumatology, is the most appropriate for the treatment of Plaintiff's condition, did not find Plaintiff to be disabled from her job.  Rather, he found her to be capable of performing light to medium manual work.  Plaintiff's employer's description of her physical duties as a Branch Manager I shows that, at most, her primarily sedentary job would require light manual work.

The other treating physician whose specialty would be appropriate for the treatment of bursitis, sciatic nerve and lower back pain is Plaintiff's physiatrist, Dr. Kim.  Tests performed by Dr. Kim, however, do not substantiate Plaintiff's claimed disabling condition.  His tests showed that Ms. Davis had a full range of motion.  Further, Dr. Kim's records of his treatment of Ms. Davis showed that his manipulation and the joint injections he performed on her "reduced her pain considerably."

The only treating physicians who stated that Plaintiff was totally disabled from her job were Dr. Christensen, the gynecologist, and Dr. Park, the psychologist.  Neither doctor, however, performed any tests, x-rays or studies on Plaintiff with regard to her bursitis, sciatic nerve or low back pain which she claimed disabled her.  Furthermore, it is

27

doubtful that either of these two doctors is capable of rendering a qualified opinion in this regard given the nature of their respective fields of specialization -- gynecology and psychology.

To the extent that Dr. Christensen stated in his Attending Physician's Statement that Plaintiff was disabled due to her cervical cancer, this statement is totally contradicted by his reports in which he stated that Ms. Davis' cancer was successfully treated with no recurrence since 1990, and the tests performed during her June 2002 hospitalization showed no evidence of the cancer having recurred.

Similarly, with respect to Dr. Park's statement that, in addition to being disabled by her back problem, Plaintiff is totally disabled due to depression, Dr. Park provided no objective evidence to substantiate his opinion.  No formal mental examination or testing was done by Dr. Park on Ms. Davis.  Furthermore, Dr. Park's report does not establish that Ms. Davis was disabled due to her depression during the entire Benefit Qualifying Period as required under the Plan in order for her depression to constitute a disability under the Plan.

For all of the foregoing reasons, the Court finds that the Plan Administrator did not act arbitrarily or capriciously in its consideration of, and its ultimate decision denying, Plaintiff's claim for long-term disability benefits.  To the contrary, the Administrator's decision was both reasonable and rational in light of the Plan provisions.

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion to affirm the decision of the

Plan Administrator is GRANTED and Plaintiff's Motion to reverse the Plan

Administrator's decision is DENIED.


s/Gerald E. Rosen                  
Gerald E. Rosen
United States District Judge

Dated:  March 23, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 23, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry          
Case Manager